**DURANT v. HIRONIMUS, Warden.**

**No. 774.**

District Court, S. D. West Virginia.

Sept. 4, 1947.

Douglas, Obear & Campbell, by Hugh H. Obear and Orville H. Walburn, all of Washington, D. C., and Jackson, Kelley, Morrison & Moxley, by John C. Morrison, all of Charleston, W. Va., for petitioner.

L. E. Given, U. S. Atty., and A. Garnett Thompson, Asst. U. S. Atty., both of Charleston, W. Va., and Nicholas R. Voorhis, Lieutenant Colonel, JAGD, and Thayer Chapman, Major, JAGD, both of Washington, D. C., for respondent.

MOORE, District Judge.

In this case petitioner, Kathleen B. Nash Durant, seeks a writ of habeas corpus to require her release from the Federal Reformatory for Women at Alderson, West Virginia, where she is now serving a term of imprisonment imposed upon her pursuant to conviction by an army court martial.

It is alleged in the petition that the conviction was void because (1) the court martial was without jurisdiction to try her (a) for the reason that at the time of her arrest she was not a member of the armed forces on active duty; and (b) for the further reason that there was a failure to comply with the alleged mandatory provisions of the 70th Article of War, 10 U.S.C.A. § 1542, relating to preliminary investigation of charges; and also (2) that jurisdiction, if ever acquired, was lost because petitioner was deprived of her constitutional right to due process of law.

The facts may be briefly stated as follows:

Petitioner entered the United States Army as a private on July 17, 1942. In February, 1943, she became an officer, and by successive promotions was advanced to the rank of captain on September 4, 1944. She served in the European Theater of Operations from July 12, 1945, to February 9, 1946. She then returned to the United States for separation from the service, landing on March 3, 1946. She was sent to the Camp Beale, California, separation center, where, on March 9, 1946, orders were delivered to her by the commanding officer, granting her and other officers leave of absence for the period of her accrued leave (so-called "terminal leave" orders). The pertinent part of these orders was as follows:

"The following officers are granted leave of absence and travel time as indicated, effective 9 March 1946, and will proceed to home or unit rendezvous so as to arrive there at not later than date of EDCMR on which date DP O are relieved from active duty, not by reason of physical disability AUS appointments held will continue in force during period of present emergency plus six months unless sooner terminated DP. Officer will be given WD AGO Form 53—98. Officer authorized to visit Mexico and Canada during period of terminal leave." (The time indicated was 81 days as leave and 2 days travel time.)

At the time petitioner received the terminal leave orders, she was given the first installment of her mustering-out pay of $300, amounting to $100, in cash. The balance of $200 was to have been paid to her in two subsequent installments of $100 each, one in June, 1946, and the final one in July, 1946.

Her identification card, issued to her on January 15, 1945, was perforated with the word "INACTIVE" and returned to her; and she was told that it could not thereafter be used for the purpose of trading at the Post Exchange or Commissary. She was also given an Honorable Service lapel button. Before leaving the separation center, she was required to attend "one or two" orientation lectures.

As a part of the procedure at Camp Beale Separation Center, on March 9, 1946,

a certificate of service was prepared and signed by petitioner. The record is not clear as to when it was signed by the executive officer of the separation center. It was dated May 30, 1946, that being the expiration date of petitioner's 81 days of terminal leave, and was placed in a suspense file for mailing when the date should arrive. (This certificate of service was later sent to petitioner and received by her on August 17, 1946.)

Petitioner then left Camp Beale. The record is silent as to her further movements prior to May 28, 1946, other than as follows: Petitioner's fiance, one Colonel Jack Durant, remained overseas when petitioner returned to the United States; so, in the hope of going back to the European Theater to be near him, petitioner, in April, 1946, applied to WAC headquarters in Washington, in an effort to return to active duty for assignment abroad, and was informed that there was no opening for her, but that if one occurred she would be advised. Her fiance then returned to the United States, and on May 28, 1946, they were married in Chicago.

On May 24, 1946, one Lieutenant Banfill, who testified that she was then under assignment in the office of the Adjutant General and was "concerned with 'Recall to Active Duty of Officers,'" acting for the Adjutant General, wrote orders directed to petitioner at 1409 Third Street, Hudson, Wisconsin, as follows:

"1. By direction of the President, so much of paragraph 5, Special Orders 68, Headquarters Separation Center Camp Beale, California dated 9 March 46 as pertains to Captain Kathleen B. Nash, L918024, WAC states that subject officer will revert to inactive status on 30 May 46, is hereby revoked.

"2. The unexecuted portion of terminal leave granted Captain Kathleen B. Nash by above-mentioned Special Orders is hereby terminated effective 28 May 46.

"3. Captain Kathleen B. Nash, L918024, WAC 1409 Third Street Hudson Wisconsin is relieved from assignment to Separation Center #42 Camp Beale, California and is assigned to Reception Station #7 Ft. Sheridan, Ill. She will proceed from Hudson, Wisconsin to station assigned, reporting on 29 May 1946."

Proposed distribution of copies of these orders was listed as follows at the end of the orders:

"CO SEP CTR CP BEALE, CALIF.
"CO REC STA FT SHERIDAN, ILL.
"LT. ROCKWELL RM 3511 MUN BLDG.
"PMGO MAJ. SALB, PROVOST MARSHAL DIV RM 1218 TEMPO C BLDG.
"COL. McCLURE WDGS G-1 RM 2 C 934 PENTAGON BLDG.
"OFFICER (10)."

The orders were placed in a box on Lieutenant Banfill's desk, from which it was the custom to remove them for mailing by a messenger employed for that purpose. Petitioner did not receive any copy of these orders prior to her arrest, nor is there any evidence in the record that they were received by any person listed therein as a proposed distributee thereof.

On the same date (May 24, 1946) Lieutenant Banfill sent petitioner, to the same address as that appearing in the orders, the following telegram:

"WD LTR ORDERS BEING MAILED TODAY RECALLING YOU TO ACTIVE DY EFF 29 MAY 46 AND ASSIGNING YOU REC STA FT SHERIDAN ILL BY ORDER SW CITE IN REPLY SPXPO-A-C- WITSELL TAG WASHINGTON DE 241709Z"

This telegram was received by petitioner on May 29, 1946, when she and her fiance, now her husband, returned to the Hudson, Wisconsin, address (her sister's house) after their marriage in Chicago. She immediately telegraphed Reception Center No. 7, Fort Sheridan, as follows:

"ORDERS 0900 29 MAY, REPORT FORT SHERIDAN SAME DATE FOR RETURN ACTIVE DUTY. DO NOT DESIRE FURTHER ACTIVE DUTY. AWAIT REPLY HUDSON."

On May 31, 1946, she again sent a telegram to Reception Center No. 7, Fort Sheridan, which was as follows:

"CANNOT UNDERSTAND RECALL ACTIVE DUTY WAS DISCHARGED MARCH 9 FORTY-THREE MONTHS CONTINUOUS SERVICE IN APRIL I CALLED AT WAC HDWTS WASHINGTON DC. ASKED MAJOR HEREBERT IF THERE WAS A POSSIBILITY OF MY RETURNING ETO TO BE NEAR MY FIANCE SHE INFORMED ME THERE WAS NOT A CHANCE AS THEY HAD SO MANY WAC OFFICERS ASKING FOR DUTY OVERSEAS. WITH THAT INFORMATION MY FIANCE CAME BACK WAS RELEASED FROM ARMY WE ARE NOW MARRIED AND ON OUR HONEYMOON. WILL GO DIRECTLY TO WD WASHINGTON D. C. AND MAKE AN APPEAL FOR DISCHARGE TO BE EFFECTIVE."

On June 2, 1946, petitioner telephoned to Fort Sheridan, talking with three different people, and inquired whether she should report there the following day. She was told that the person from whom she was inquiring knew nothing about it, and that she should "come out tomorrow when there are others on duty."

At 2 o'clock A. M. on June 3, 1946, petitioner was arrested by Military Police. On the same morning she was questioned for several hours at the office of a private investigator, and before going to lunch at 1:30 P. M. had dictated a statement in the nature of a confession, which she signed on the same day. During that night she was confined in a psychopathic ward in the hospital at Fort Sheridan, and on the following day was moved to a private room. She was permitted to talk with her husband by telephone, to confer with him in private, and to have dinner with him once in a public restaurant. Afterwards, on June 6, 1946, she signed a second confession. Both confessions were later used against her when she was tried by the court martial. · Charges were then served on petitioner, similar but not identical with the charges on which she was later tried. So far as the record shows, these charges have never been dismissed nor have they been made the subject of any investigation under the 70th Article of War.

After her arrest, petitioner, on demand of the army, returned the $100 installment of mustering out pay which she had received, and thereafter, while in custody and up to her conviction, drew her captain's pay and allowances each month.

Petitioner was transported to Germany, where, on August 8, 1946, she was served with the formal charges on which she was later tried. On August 10, 1946, Colonel Paul H. Chalmers, Deputy Headquarters Commandant in the European Theater, at Frankfort-am-Main, Germany, made an investigation of these charges, pursuant to the 70th Article of War. No witnesses were examined, but written statements of witnesses were read to petitioner. She requested the attendance of three witnesses. One of these was an army sergeant who was at that time in the United States. The other two were the Princes Wolfgang and Philip von Hessen. These two German princes were at that time in army custody at Darmstadt, a place about twenty miles distant from the town where the investigation was being conducted. A telephone call by an assistant staff Judge Advocate to the officer in whose custody the princes were resulted in information that they were not available. Petitioner's counsel, being informed of this, and being told that he would be given an opportunity to interview these two princes privately, which he later did, orally waived their production at the preliminary investigation.

Petitioner was brought to trial by court martial on August 22, 1946, found guilty on most of the charges, and sentenced to a term of five years imprisonment. The conviction and sentence were confirmed by the Secretary of War, and she is now engaged in serving the sentence.

On the day of the trial, she requested that her husband, an attorney, be permitted to represent her, in addition to counsel previously chosen by her. At that time her husband was in custody on similar charges, of which he was later convicted. Her request was denied.

█ █ In deciding whether petitioner should continue in custody or be released, I need hardly say that I am not concerned with the question of her guilt or innocence.

She may in fact be innocent; yet if she has been tried and convicted by a tribunal vested with jurisdiction to act in the premises, she must submit to its judgment. Ex Parte Mason, 105 U.S. 696, 26 L.Ed. 1213. On the other hand, however certain her guilt may be, she cannot be required to undergo punishment for her offense under the judgment of conviction if the court which pronounced that judgment lacked jurisdiction to try her, or, having jurisdiction, lost it by depriving her of a constitutional right. In re Metzger, 46 U.S. 176, 12 L.Ed. 104; Ex parte Parks, 1876, 93 U. S. 18, 23 L.Ed. 787; Norton v. Zerbst, 1936, 10 Cir., 83 F.2d 677, Certiorari denied 299 U. S. 541, 57 S.Ct. 24, 81 L.Ed. 398. Such is our traditional concept of the right of the individual as against the State. It is this question of jurisdiction which is squarely presented by the pleadings and proof in this case.

■ On consideration of the briefs submitted by counsel on both sides, I find no merit in the argument of petitioner's counsel in support of the allegation that the 70th Article of War was not substantially complied with. On the contrary, the evidence is convincing that the proceedings of Colonel Chalmers in investigating the charges were in substantial compliance therewith. The pertinent part of this Article is as follows:

"No charge will be referred to a general court martial for trial until after a thorough and impartial investigation thereof shall have been made. This investigation will include inquiries as to the truth of the matter set forth in said charges, form of charges, and what disposition of the case should be made in the interest of justice and discipline. At such investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available and to present anything he may desire in his own behalf either in defense or mitigation, and the investigating officer shall examine available witnesses requested by the accused. If the charges are forwarded after such investigation, they shall be accompanied by a statement of the substance of the testimony taken on both sides."

The substance of the evidence expected from witnesses for the prosecution was communicated to petitioner. No witnesses were examined, because none were available. The mere fact that the two German princes whose presence was requested by petitioner were in army custody at a place only twenty miles distant from the town where the investigation was being conducted does not of itself establish availability. They were being held there as witnesses in the highly important War Crimes Trials then in progress, and their production at Frankfort-am-Main would have required numerous clearances, as well as special arrangements for feeding and guarding. In these circumstances, and particularly since petitioner's counsel, being assured that he could later interview the two princes, orally waived their production at the investigation, I conclude that there was no substantial failure to comply with the requirements with Article 70. In view of this conclusion, it is unnecessary to consider petitioner's contention that Article 70 is mandatory, and that failure to conform to it results in lack of jurisdiction on the part of the court martial.

■ In considering the argument advanced by petitioner's counsel that she was deprived of her constitutional right to due process of law by the use against her at her trial of two confessions which it is claimed were extorted from her by duress and coercion; by refusal to allow her husband to act as her attorney; and by the use, as counsel argues, of the original charges as a means of holding petitioner in custody while constructing a "case" against her, I have proceeded on the theory, as announced during the trial, that decision of factual questions on which there was conflicting evidence was for the court martial. I could not properly review or reverse their findings, unless there were sufficient uncontradicted evidence in the record to show clearly a denial of petitioner's constitutional rights. The admitted facts, in my opinion, fall far short of the mark, and I therefore dismiss this contention as being without merit.

Petitioner relies mainly on the asserted proposition that the court martial lacked

jurisdiction to try her, because she was not at the time of her arrest a member of the armed forces on active duty. She maintains, first, that an officer on terminal leave is on inactive duty, and cannot lawfully be recalled to active duty for the sole purpose of court martial proceedings; secondly, that her terminal leave orders were never effectively revoked; and lastly, that in any event she was separated from the service on May 30, 1946, by reason of a Certificate of Service issued as of that date by the Executive Officer at Camp Beale Separation Center and afterwards delivered to her. Respondent disputes this proposition in all its phases.

■ Counsel have cited no cases which are decisive of the precise points involved, and I have found none. It was conceded by counsel for respondent, however, in the course of the trial, that an officer on inactive duty is not subject to the jurisdiction of a military court, nor can such officer be recalled to active duty for the sole purpose of court martial proceedings; and this concession is borne out by a ruling of the Judge Advocate General, cited in petitioner's brief. See Bulletin of the Judge Advocate General, February, 1946, at page 35. See also United States ex rel. Viscardi v. McDonald, D.C. 1920, 265 F. 695; United States ex rel. Santantonio v. Warden or Keeper of Naval Prison in Navy Yard, Brooklyn, New York, D.C. 1919, 265 F. 787; CM 307101, Allen; CM 283459, Reid; CM 312219, Murray, Memorandum.

The question which the Court must decide, therefore, is: Was petitioner an officer on active duty at the time of her arrest? If so, the court martial had jurisdiction; if not, it lacked jurisdiction.

■ The Judge Advocate General has held in numerous opinions that officers on terminal leave are still in an active duty status. SP JGA, 1945/13372, 14, December 1945; SP JGA, 1946/2188, 1, March 1946; SP JGA 1945/2522, 9, March 1945; SP JGA, 1945/10482, 10, October 1945; SP JGA 1944/6985, 6, July 1944. These rulings of the Judge Advocate General, while entitled to considerable weight with the Court, are not controlling. The Court must

arrive at such conclusion upon the law as the facts of this particular case require.

It is clear that the Judge Advocate General himself regarded the active duty status of an officer on terminal leave as being only technical, for he said in an opinion written in 1945;

"Although an officer of the Army on terminal leave is normally *not called upon to perform duty,* he is nevertheless in an active duty status and is not, *technically speaking,* separated from the service or relieved from active duty, as the case may be, until the expiration of his terminal leave." (Emphasis supplied.) SP JGA 1945/10482, 10, October 1945.

To the same effect is Army Regulation 605—115, § 111, in which it is indicated that retention of an officer on terminal leave in active duty status is for the purpose of paying him compensation, which otherwise could not be done. When Congress was considering the bill which was later enacted as the Armed Forces Leave Act of 1946, the Senate Military Affairs Committee, in a report dated July 11, 1946, said:

"It has been the policy of both the War and Navy Departments to permit officers to take advantage of accumulated leave *upon relief from active duty.* This means that an officer, *although for practical purposes relieved from active duty,* actually remains upon the Government payroll for a period of time equivalent to the amount of leave that has accumulated to his credit." (Emphasis supplied.) Senate Report No. 1704, July 11, 1946—79 Congress, 2nd Session, 1946, U.S. Code Congressional Service 1946, page 1342.

It is fair to assume, I think, that this language of the Committee stated correctly the policy of the army and navy concerning terminal leave prevailing up to that time, and its practical meaning and application.

Petitioner was sent to Camp Beale for separation from the service. It was a separation center. She was given lectures to prepare her for civilian life. One-third of her mustering out pay was delivered to her. A certificate of service, effective May 30, 1946, was filled out and signed

by her, and by the chief of officers' affairs (possibly by the executive officer as well). Her identification card was perforated with the word, "INACTIVE." She was given an "Honorable Service" lapel button. An order was delivered to her which said, in effect: "You are placed on terminal leave, expiring on May 30, 1946. You may go home or elsewhere. You need not report hereafter to any superior authority. You are relieved from active duty, effective on the date your terminal leave expires."

From these facts it is clear to me that for all practical purposes petitioner was separated from active service in the army when she left the separation center at Camp Beale. There remained no duty for her to perform, and everything which would ordinarily be expected to precede a separation had been done. She was held in a technical "active duty" status only that she might be kept on the army payroll and paid for a period of accumulated leave. There was no provision of law which would have allowed payment for accumulated leave to be made to her in a lump sum; otherwise, she would doubtless have been paid in full on the spot, and her certificate of service delivered to her then. She was not a part of the strength of the army. Although it was the practice at that time to include in the daily strength report officers on terminal leave, Congress corrected this practice as a misconception when it later enacted that it should not be followed. 50 U.S.C.A. Appendix, § 303 (a).

It was recognized by her commanding officer that petitioner was being relieved from active service on March 9, 1946, when he caused one-third of her mustering out pay to be delivered to her at that time. The statute provides:

" * * * each member of the armed forces who shall have been engaged in active service in the present war, and who is discharged or relieved from active service under honorable conditions on or after December 7, 1941, shall be eligible to receive mustering-out payment." 38 U.S.C.A. § 691a(a).

The same statute, in § 691b(b), provides that such payments shall be made to the person eligible by paying one-third of the stipulated amount at the time of final discharge (referring to enlisted personnel) or *"ultimate relief from active service"* (referring to officers). Petitioner was not entitled to any part of her mustering out pay until she was "ultimately relieved from active service." The fact that she received the first installment on March 9, 1946, is convincing evidence that the terminal leave orders were regarded as relieving her, for practical purposes, from active duty. The fact that after her arrest she repaid the $100 of mustering out pay, at the request of the finance department of the army, cannot alter the effect of its having been paid to her on March 9, 1946.

The Adjutant General's office also regarded terminal leave as an inactive duty status. This is shown by the testimony of Lieutenant Banfill, who said her assignment was "concerned with 'Recall to Active Duty of Officers.'" The telegram sent to petitioner on May 24, 1946, advised her that she was being "recalled to active duty." It will not do to argue, as counsel for respondent does, that this was mere "inartful phrasing." The use of these words, followed by Lieutenant Banfill's testimony on the stand, indubitably shows that she, at least, acting for the Adjutant General, regarded terminal leave as inactive duty, and that this idea was so far shared by her superior officers that a section was set up in the Adjutant General's office which was known as the "Recall to Active Duty" section, and was concerned with recalling to active duty officers on terminal leave.

So I conclude that petitioner's actual status while on terminal leave, as distinguished from her technical status for pay purposes only, was that of an officer on inactive duty.

Moreover, if it be conceded, arguendo, that petitioner's status while on terminal leave were other than inactive, there would then remain the further question: Were her terminal leave orders properly revoked, or did they remain in effect, and by their self-executing terms, release her from active duty on May 30, 1946? It is necessary in this connection to consider the effect

of the telegram received by petitioner on May 29, 1946. It must be borne in mind that petitioner, on April 9, 1946, had made a personal request to be returned to active duty in the European Theater, and had been told that if any opening occurred she would be advised. On receipt of the telegram it is evident that she thought, as she naturally would think, and as she testified that she did think, that it was the result of her previous application. No mention is made in the telegram of any revocation of terminal leave. The most that can be said of the effect of this telegram is that it gave petitioner notice that the army was now willing to comply with her request made on April 9, 1946, and that orders to that effect were being mailed to her. She had no reason to believe that the orders would be enforced against her will.

■ ■ Petitioner never received these orders prior to May 30, 1946. It is well settled that military orders are of no effect until received by the person named therein. This was conceded by counsel for respondent in the course of the trial. And see CM 211586, May 10, 1939, Volume 10, page 107; Bulletins of Judge Advocate General, 1944, Vol. 3, page 449; Vol. 3, page 406; 1945, Vol. 4, page 456. There is no evidence that these orders were delivered to any person listed as a distributee thereof. If they had been received by any of these persons, that fact could easily have been shown. A strong inference that the orders were not received at the Camp Beale Separation Center arises from the fact that the authorities there proceeded to issue the certificate of service, in compliance with the usual routine followed in other cases of officers whose terminal leave had expired. It is my conclusion that petitioner's terminal leave orders were never effectively revoked, and that by their self-executing provisions she was finally and formerly separated from the service on May 30, 1946.

■ I am further of opinion that the certificate of service which she later received, like an honorable discharge in cases of enlisted personnel, is a formal and solemn act on the part of the Adjutant General of the Army, which, in the absence of a showing that it was issued through mistake or by an unauthorized person, cannot be impeached. There is no such showing in this case. See United States v. Kelly, 82 U.S. 34, 21 L.Ed. 106.

■ I have given consideration to the argument of counsel for respondent that accrual of further leave during the period of terminal leave is indicative of active rather than inactive status; as well as the contention that petitioner, by accepting officer's pay during the period of her confinement prior to conviction, is estopped to deny now that she was subject to military discipline. These arguments are not without force. However, accrual of additional leave to officers on terminal leave evidently results from an administrative interpretation of the statute in force during the period in question (since repealed by the 1946 Armed Forces Leave Act), which provided that "all officers on duty shall be allowed * * * leave of absence" at the rate of thirty days a year for a period not to exceed four years. See 10 U.S.C.A. § 842. Being based on a mere administrative ruling, the practice can have no more weight in the decision of the question involved than other rulings of army boards or departmental heads. Moreover, it will be noted that while the old law allowed leave to all officers *on duty* (without qualification as to active or inactive duty) the Armed Forces Leave Act, 10 U.S.C.A. § 18, specifically provides that leave shall be allowed only for periods of *active service*. It is not necessary, therefore, in order to support the opinion I have expressed, to conclude that the administrative interpretation of the statute, and the practice of accruing additional leave based thereon, were erroneous.

■ In contending that petitioner, by accepting officer's pay after her arrest, is estopped to deny military jurisdiction, counsel for respondent lose sight of an important principle. Military courts, like the District Courts in the Federal system, are courts of strictly limited jurisdiction. Their powers are only such as are conferred by statute. 10 U.S.C.A. § 1473, § 1483; Cole v. Blankenship, 4 Cir., 30

F.2d 211. Jurisdiction cannot be given them by consent of parties. See 22 Op. Atty. Gen. 137. Jurisdiction, once having attached, cannot be divested by subsequent events (Carter v. McClaughry, 183 U.S. 365, 22 S.Ct. 181, 46 L.Ed. 236), nor, once lost, can it be restored by subsequent changes in status. Lack of jurisdiction can never be waived, either expressly or by implication. Ver Mehren v. Sirmyer, 8 Cir., 36 F.2d 876. In view of this principle, which I believe is too well established to admit of doubt, the contention becomes untenable.

For all the foregoing reasons, I am of opinion that the court martial proceedings were void for lack of jurisdiction. An order may be entered discharging petitioner from custody, pursuant to the writ of habeas corpus heretofore issued.